(84 South. 831)

MOODY, Probate Judge, et al. v. GUNTER et al. (8 Div. 154.)

(Supreme Court of Alabama. Dec. 18, 1919. Rehearing Denied Feb. 20, 1920.)

1. COUNTIES ⬤⟿150(2) — INDEBTEDNESS OF COUNTY TO BE CREATED IS NOT "DEBT ALREADY INCURRED," WITHIN CONSTITUTIONAL LIMITATION.

A debt authorized or required by existing law to be created in the future is not a debt already incurred, because not created, within the meaning of Const. 1901, § 224, providing that any county, having already incurred a debt in excess of 3½ per centum of its assessed value, may incur an additional indebtedness of 1½ per centum.

2. COUNTIES ⬤⟿150(1)—CONSTITUTIONAL PROVISION PERMITTING AN EXCESS OF INDEBTEDNESS LIMITATION APPLICABLE TO THEN EXISTING, NOT FUTURE, ASSESSMENT VALUES.

Const. 1901, § 224, providing that any county, having already incurred a debt exceeding 3½ per centum of its assessed value, which was the limitation placed, should be authorized to incur further indebtedness of 1½ per centum, was intended by its framers to give relief to counties which at the time of its adoption happened to be then indebted in excess of 3½ per centum, but was limited to the assessment values then existing, and was not intended to last in perpetuity and apply to subsequent values.

---

⬤⟿For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**3. CONSTITUTIONAL LAW** ☞16—**INTERPRETA-**
**TION OF CONSTITUTIONAL TAX PROVISION IN**
**LIGHT OF CONVENTION DEBATES.**

In determining a constitutional tax limitation, in so far as the constitutional convention debates indicate the judgment of the convention and not mere personal opinion of the speakers, the courts may use them for the purpose of interpretation.

Thomas, J., dissenting.

Appeal from Circuit Court, Jackson County; W. W. Haralson, Judge.

Bill by J. H. Gunter and others, resident citizens and taxpayers, against J. B. Hackworth, as Judge of Probate, and the other members of the Commissioners' Court of Jackson County, and the contractor, to enjoin the building of the courthouse, and to declare void certain interest-bearing warrants. Hackworth and others having gone out of office, the new Judge of Probate and members of the Commissioners' Court are substituted as parties respondent, along with the original contractor. From the decree granting relief, A. H. Moody, as Judge of Probate, and the other substituted respondents, together with the original contractor, appeal. Affirmed.

The facts sufficiently appear from the opinions and from the original case, as reported in 182 Ala. 205, 62 South. 101.

Bouldin & Wimberly, of Scottsboro, for appellant. Counsel invite the court to a restudy of the provisions of section 224, Const. 1901, and Gunter v. Hackworth, 182 Ala. 205, 62 South. 101. And in support of their contention that the proper view was not taken thereof they cite 4 Words and Phrases, 3527; 5 Abb. Prac. 162; 138 Ala. 174, 35 South. 114. On the doctrine of laches and estoppel, they cite 15 Corpus Juris, 644, § 356, and cases there noted; 193 Ala. 521, 68 South. 971; 199 Ala. 642, 75 South. 17; 163 U. S. 427, 16 Sup. Ct. 1120, 41 L. Ed. 215; 107 U. S. 348, 2 Sup. Ct. 62, 27 L. Ed. 378.

Cooper & Cooper, of Huntsville, for appellee. Counsel cite, as supporting the correctness of the lower court's finding, the following: Section 224, Const. 1901; 138 Ala. 164, 35 South. 114, and the former opinion in this case.

PER CURIAM. This case has been here before under the title Gunter v. Hackworth, 182 Ala. 205, 62 South. 101. On the present appeal, which seeks to review the ruling of the court in Gunter v. Hackworth, the record was assigned to Judge Thomas, and he prepared the opinion, which appears below as a dissent. On the former appeal we noted the fact that by the act of December 7, 1898

(Loc. Acts 1898–99, p. 43) the court of county commissioners of Jackson county had been "authorized, empowered and required" to issue bonds of the county to the amount of $250,000 to provide for the construction of macadamized roads and bridges in said county. The act referred to was amended at the same session of the Legislature (Loc. Acts 1898–99, p. 790), and upon the whole act, as amended, it is not at all clear that the court of county commissioners had not a discretion whether they would expend the entire amount of the bond issue authorized.

[1] But, apart from that, the court is of opinion that there is no need to disturb the ruling of Gunter v. Hackworth. Judge Thomas' opinion would overrule Gunter v. Hackworth, 182 Ala. 205, 62 South. 101, in two particulars, viz.:

(1) He holds, in effect, that an indebtedness authorized by statute at the adoption of the Constitution, but not then yet incurred— "incurred" is the word used by the Constitution, and none other seems to meet the situation fully—may be considered for the purpose of fixing the then indebtedness of the county in excess of 3½ per centum of the assessed value of the property therein. Such a ruling would no doubt prove a great convenience to the creditors of the county of Jackson; but a debt merely authorized, or required by existing law to be created in the future, is neither a debt already incurred, nor, for that matter, is it a debt already created, and no labor of discussion can make it so. Now the language of the Constitution (section 224) is that—

"Any county which has already incurred a debt exceeding 3½ per centum of the assessed value of the property therein shall be authorized to incur an indebtedness of 1½ per centum of the assessed value of such property in addition to the debt already existing."

In every other case—even the case in which the debt already incurred fell short of 3½ per centum of the assessed values of the county by the narrowest margin, the county was by the first clause of the section forbidden to become indebted in an amount, including then present indebtedness, greater than 3½ per centum of the assessed value of the property therein. Substantially that was the situation of Jackson county, and, while that may be regretted, it cannot be avoided if the plain letter of the Constitution is to prevail.

[2] (2) He also holds that the additional indebtedness of 1½ per centum, which a county is allowed to incur in the event it has already incurred a debt exceeding 3½ per centum of the assessed value of the property therein, means 3½ per centum of the assessed values at the time when the county seeks to avail itself of the privilege of an additional indebtedness of 1½ per centum, though

such contingency may be deferred for many years after the adoption of the Constitution. In other words, the opinion holds that many years hence some counties may become indebted to the extent of 5 per centum of their assessed values, while others, then practically their equals in population, wealth, and enterprise, shall still be bound by the limitation of 3½ per centum; the class in which they fall depending, as we said in Gunter v. Hackworth, upon whether their indebtedness at the time of the adoption of the Constitution exceeded, or was less than, in however small an amount, the limit of 3½ per centum of values as assessed for the year 1901, the year in which the Constitution was adopted. We cannot think any such result was intended. What the framers of the Constitution intended was to give relief to counties which at the time of adoption happened to be then indebted in excess of 3½ per centum, but that relief was limited to exigencies and values then existing, and was not intended to last in perpetuity.

[3] Reference is made to the debates of the Constitutional Convention. So far as the report of these debates indicates the judgment of the convention, and not the mere personal opinion of the speakers quoted, the office of interpretation may have regard for them. It may be very seriously doubted, however, that the debate which has been quoted in this case, tends to shed any light whatever on the question as to the full meaning of the convention in adopting the section under review; but, if it need be considered, it is proper to say that the journal of the debate was examined when the opinion in Gunter v. Hackworth was in preparation, and seemed then, as it does now, to sustain the conclusions then announced.

It follows that the decree in this cause should be affirmed.

Affirmed.

All the Justices concur, except

THOMAS, J. (dissenting). The question at issue being important, and differing with my Brothers as to the correctness of the former decision in Gunter v. Hackworth, supra, I am impelled to state my views:

The bill by subsequent amendment avers that the assessed value of the property for taxation in Jackson county was $4,133,243 at the time of the adoption of the present Constitution (November 28, 1901, Seay's Compiled Amendments to the Constitution, p. 1), and that the assessed value was $6,296,430 at the time of filing the amendments to the bill. The indebtedness of that county is averred to have been $262,000 at the time of the amendment to the bill (on July 16, 1912), exclusive of the liability of $39,299 created under the contracts with Little-Cleckler Construction Company, dated April 30 and May 25, 1912, respectively. It is further averred

that an indebtedness was created of $302,000, an amount greater than 3½ per centum of the assessed value for taxation of the property in said county; that on the date when the Constitution became effective the county had not "already incurred a debt exceeding 3½ per centum of the assessed value of the property therein"; that the indebtedness of the said county at that time was $125,000, including the road and bridge bonds issued and sold.

The bill as last amended (on May 10, 1915) contained the further averments:

That "the said county of Jackson was indebted at the time of the execution of the contracts with the Little-Cleckler Construction Company, on, to wit, the 30th day of April, 1912, and the 25th day of May, 1912, respectively, and independent of the sums therein contracted to be paid, in the sum of $260,000 or more, and in the execution of the said contracts with the Little-Cleckler Construction Company the said commissioners'· court created a debt for the said county of Jackson, which, added to its then present indebtedness, aggregated a sum in excess of $300,000—an amount greater than 3½ per centum of the assessed value for taxation of the property in said county of Jackson, at the time of the adoption of the Constitution aforesaid, and at the time the said contracts with the Little-Cleckler Construction Company were executed"; that said county, at the time of the execution of said contracts with the construction company, had and has now a bonded indebtedness aggregating the sum of $250,000, issued under an act of the Legislature approved December 7, 1898; said bonds having been issued on the dates and in the sums indicated as follows:

| "March | 1, 1900 | $75,000 |
| September | 1, 1900 | 18,000 |
| March | 1, 1901 | 32,000 |
| March | 1, 1902 | 62,500 |
| September | 1, 1902 | 62,500 |

$250,000"

I may observe, of the averments of fact contained in the bill as last amended, that, if said bonded indebtedness of the county be deducted from its total indebtedness, its general indebtedness, thus increased, at the time the contracts became or were sought to be made effective, was not by the facts averred, shown to exceed 1½ per centum of either of the assessed values of taxable property in the county. The overruling of respondent's demurrer to the amended bill presents for reconsideration the construction heretofore given in this case to section 224 of the Constitution. It will be necessary to trace the history, nature, and legal effect of this bonded indebtedness created under the act in question (Local Acts of Alabama 1898, pp. 43–50), to determine how (in addition to being "authorized and empowered," it was "required," by the act to issue said bonds for the designated purpose) it affected the

power of Jackson county to contract other debts under the Constitution of 1901.

The provisions of section 224 of the Constitution were not contained in the Constitution of 1875, and were in response to a necessity urged on the convention by its learned chairman, Mr. Knox, who said:

"The authority of county and municipal governments to create debts totally beyond the resources must be looked to. * * * The framers of the present Constitution carefully stipulated a maximum rate of taxation (section 5, art. XI, 1875), but made no provision against the creation of debt over and beyond the resources of the county or municipality. * * * Some just provision should be incorporated, limiting the power to create debt beyond the reasonable ability of the county or municipality to pay." Journal, Const. Conv. of Ala. 1901, p. 19.

This well known evil was sought to be remedied by the insertion in the Constitution of 1901 of arbitrary provisions limiting indebtedness of the respective municipalities. Hagan v. Commissioners' Court of Limestone County, 160 Ala. 544, 551, 552, 49 South. 417, 37 L. R. A. (N. S.) 1027. In construing the several provisions and exceptions contained in section 224 of the Constitution it was said that "the purpose of the inhibition must be kept in mind." The debates of the Constitutional Convention may be of assistance to a proper interpretation of the important powers and limitations contained in section 224 of the Constitution. The debt limit of counties and cities being under discussion, Mr. J. B. Weakley, the chairman of the committee on municipal corporations, said:

"In my opinion the question of a debt limit is more important than the question of a tax limit. If the Constitution of 1875 had inserted in it some limitations upon the taxing power of the cities and counties of this state to create debts, the present financial condition with which we are confronted would not' exist to-day. * * * I have given the matter some investigation, and, so far as I am able to find out, there is not a county in the state of Alabama that would be seriously affected by this limitation, and I do know, Mr. President, there is one county in the state that has contracted a debt of exactly 5 per cent. of its assessed valuation, and has defaulted in its interest, and is unable to pay it, and that, too, when one-half of this debt is bearing interest at the rate of only 5 per cent. per annum. If gentlemen will take the report of the state auditor, * * * they will see there the statement of the total assessed valuation of every county in the state, and each member can calculate for himself how much his county will be allowed to create under this limitation. I doubt not, Mr. President, after that calculation has been made, every member will come to the conclusion that a limit of 5 per cent. will allow all the debt that the county in reason ought to create.

"Gov. O'Neal: You understand this section to mean, then, that you could not impose a tax greater than 3 per cent., and you must include in that the debt which already exists?

"Mr. Weakley: Yes, sir.

"Gov. O'Neal: The bonded debt that already exists has got to be included in that 3 per cent?

"Mr. Weakley: Yes.

"Gov. O'Neal: And counties that now have that limit—

"Mr. Weakley: Cannot create any additional debt. * * *

"Gov. O'Neal: How many states in the Union have this limit?

"Mr. Weakley: The gentleman asks how many states in the Union have this debt limit. I answer him that probably two-thirds or probably three-fourths of the states in the Union have a debt limit. It is recognized everywhere, * * * as more important than the tax limit, because, if the debt is not created, the tax will not have to be levied to pay it.

"Mr. Watts: I am opposed to the amendment of the gentleman from Lauderdale. I do not think the 5 per cent. should be stricken out and 3 per cent. substituted. It would not do for the county of Montgomery. * * * *"

Mr. Sanders offered a substitute as follows:

"No county shall become indebted in an amount greater than *three per centum* of the taxable valuation of the property thereof, provided this limitation shall 'not affect any existing indebtedness exceeding such three per centum which have already been created, or which have been authorized by law to be created."

Later Mr. Kirk offered an amendment to section 9, by adding:

"Except where it may be necessary for the erection of bridges and county buildings, which may be paid for by a levy of a special tax" (thirty-fifth day of convention).

On the thirty-sixth day of the convention discussion of the subject was resumed. Mr. Kirk spoke of his amendment as follows:

"Take my county, that has *already exceeded a limit of 5 per cent.*, and if her courthouse and every bridge in the county were swept away, we would be unable to raise money to replace those bridges or to rebuild the courthouse. Now, I submit to the gentleman that it would be a very bad condition for any county to get into, with her courthouse destroyed, her bridges swept away, and [be] unable to create a debt by which she could replace those improvements. Then I think it is wise to adopt the amendment I offer, providing in cases of that kind, where the county has created a debt up to the amount of the limit, that it may, when necessary, increase that indebtedness for the purpose of erecting buildings and county bridges. It seems to me that will address itself to the attention of every delegate here who feels an interest in the welfare of his county.

"Mr. White: Should your county have the opportunity to go more in debt than now?

"Mr. Kirk: Yes."

In the course of the discussion, Gen. Harrison offered the following amendment:

"No county shall become indebted in any amount greater than 3½ per cent. of the taxable

value of the property thereof: Provided, this limitation shall not apply to any existing indebtedness in excess of such 3½ per centum which has *already been created or authorized by now existing law to be created."*

It will be observed that this is the first limitation or proviso embraced in section 224 of the Constitution.

"Mr. Watts: I want to ask the gentleman from Lee a question. I want to know what he means by the expression *'now existing law.'*

"Judge Coleman: *Some bonds have been authorized, but not issued, and this would cover that."* (Italics supplied.)

Mr. Carmichael (of Colbert county) offered a further amendment as follows:

"Provided, that any county which is already indebted in an amount which equals or exceeds the debt limit herein provided, may, for the erection of the necessary public buildings, borrow in addition to said 3½ per cent., a sum not greater than 1½ per cent. of the assessed valuation of the taxable property of said county."

Mr. Carmichael said:

"It specifically says that provided that any county which has already contracted an indebtedness exceeding the limit, which is 3½ per cent. now, that they may, for the purpose of building courthouses and jails, *and for the ordinary expenses of the county,* contract an additional indebtedness of 1½ per cent. Now that only makes 5."

The chairman of the committee on municipal corporations later referred to the action of the convention as follows:

"The convention this morning adopted a provision fixing the debt limit of counties at 3½ per cent., which under certain conditions might be increased to 5 per cent. It occurs to me with a debt limit of 3½ for counties, a debt limit of 7 per cent. for cities, making the entire debt limit of a city and county a total of 10 per cent., might be a reasonably safe proposition."

Concluding the discussion of the important provision of section 224 of the Constitution, the chairman (Mr. Weakley) submitted to the convention an interesting table showing the debt limits of the several states of the Union having such a limit. The several provisions proposed for an increased indebtedness for special purposes were rejected. The second proviso in its present form became a general power to the county, under the conditions indicated, to incur an additional indebtedness for all of its municipal purposes, not to exceed 1½ per centum of the assessed value of such property in addition to the "debt already existing."

I will examine somewhat in detail the act of December 7, 1898 (Local Acts 1898–99, pp. 43–50), upheld in Sisk v. Cargile et al, 138 Ala. 164, 175, 35 South. 114 which provided for the building and construction, "by and through a road commission consisting of five persons, to be appointed by the governor," of a system of macadamized roads in Jackson county "to be in extent about two hundred and fifty miles," etc. The general location and extent of the several public highways to be so located, built, and improved are specifically designated, and the right of condemnation for such purpose is given (sections 1, 2 and 3); also to fix "the width, amount of gravel or stone or grade on any particular road," provided that said roads "shall be laid out at least 25 feet wide, 10 feet of which shall be bedded with stone or gravel," etc. (section 4). The duties and qualifications of said road commissioners are specifically declared in sections 5 to 16, inclusive, and the bonds issued under the provisions of the act are exempt from taxation by the county and municipalities thereof in section 17.

Of the duties of the road commissioners in "carrying out the intention of said bill" it is stipulated, among other things, "that immediately after the completion of the location and surveying of said roads, the commissioners shall offer a contract for construction of the whole of said roads to the lowest responsible bidder living within the county." Section 6. The time of performance of the contract is fixed at 10 months from date, with discretion in the commissioners to extend the time of fulfillment 2 months (section 7), and the building of all necessary bridges is required by section 10 of the act. Provision for the projection of the work is thus made, in the discretion of said road commissioners:

"That said road commissioners may, within their discretion, build and construct such number of miles of road, and at such places as they may see fit and proper, and to be done by contract, or as in their judgment they deem best, to be paid for out of the funds hereinafter provided for, but not until the full completion of the roads mentioned in this act." Section 11.

For the issue and sale of bonds:

"That the court of county commissioners of Jackson county is hereby authorized, empowered and required to issue bonds of said county to the amount of two hundred and fifty thousand dollars to provide for the payment of the construction and the building of said macadamized roads and the building of bridges. Said bonds to be five hundred in number and for five hundred dollars each, the interest to be not more than five and one-half per cent. per annum, payable semiannually, and evidenced by coupons attached to the bonds. Said bonds and coupons to be made negotiable and payable at some designated banking house in the town of Scottsboro, Huntsville, Alabama, or in the city of New York, state of New York. Said bonds shall be sold and negotiated to the highest bidder, the minimum price being their face value." Section 12.

"That said bonds shall be numbered from one to five hundred, consecutively; to be made

payable at the expiration of thirty years from this date, or at the pleasure of the said county of Jackson, at any time after twenty years from their date; each bond to be signed and sealed by the judge of probate court of Jackson county, and countersigned by the treasurer of said county of Jackson. The coupons attached to each bear the number of the bond to which they are attached, and payable at the place designated for the payment of said bonds in the body thereof." Section 13.

Section 14 provides when and where the bonds shall be sold.

Having thus specifically provided for the creation and discharge of the specified duties of the road commissioners to the end in view, the act lastly adverts to the powers and duties of the court of county commissioners, in payment of the interest and principal of the bonds as follows:

"That said court of county commissioners for the first twenty years after the date of said bonds, shall annually, out of the revenue of said county, set apart a sufficient amount to pay the annual interest and semi-annual interest of said bonds as the same falls due and payable, and they are further directed, at the expiration of twenty years from the date of said bonds, annually thereafter, to set apart and apply the moneys so collected to the extent of not less than one-sixth part thereof to the payment, first of the said interest, and the surplus of said one-sixth to the payment and retiring of said bonds." Section 15.

"That the said court of county commissioners are authorized to apply any surplus that may accumulate in the treasury before said bonds mature, to the purchase of said bonds or any part of them in open market, and retire them." Section 16, Local Acts 1898–99, p. 790.

The supplemental act of February 28, 1903, was "to provide means for the payment of the interest and principal of certain bonds to be issued under 'An act to authorize Jackson county to build macadamized roads and bridges, and to issue bonds of the county to aid in the construction and building thereof,' approved December 7, 1898, and acts amendatory thereto;" and contained the following provision:

That "said court of county commissioners and their successors in office are hereby authorized and required at the time of making their annual levy of taxes for general county purposes, to make a special levy on all the taxable property of the county, of such amount as may be necessary, but not exceeding one and one quarter mills on the assessed value of such taxable property." Local Acts 1903, § 1, pp. 106, 107.

This court has several times defined what is embraced in the expression "county debts or obligations," and that, generally speaking, they are of two classes:

"(1) Those which are prescribed and imposed by law, and are purely involuntary as to the county; (2) those which are merely authorized by law, and are assumed by the county with some measure of discretion, at least as to time and amount." Brown, Treas., v. Gay-Padgett Hdw. Co., 188 Ala. 423, 430, 66 South. 161, 162; O'Rear v. Sartain, 193 Ala. 275, 69 South. 554, Ann. Cas. 1918B, 593; Hagan v. Limestone Co., supra, 160 Ala. 554, 49 South. 417, 37 L. R. A. (N. S.) 1027.

The Jackson County Road and Bridge act approved December 7, 1898, in which bonds were "authorized, empowered and required" to be issued in the sum of $250,000, and sections 215 and 224 of the Constitution, in a suit for injunction to prevent the assessment and collection of taxes for the payment of the interest and principal of the bonds issued and sold by that county pursuant to said act, were construed in Sisk v. Cargile, 138 Ala. 164, 174, 175, 35 South. 114, 118. The justice observed of section 224 of the Constitution that:

"That section places a prohibition on a county to become indebted in any amount including present indebtedness greater than 3½ per centum of the assessed value of the property therein. This limitation is accompanied with a proviso, that it 'shall not affect any existing indebtedness in excess of such 3½ per centum, which has already been created or authorized by existing law to be created.' This in terms takes off and makes inoperative this limitation of power, as it affects the indebtedness of a county in excess of 3½ per centum of the assessed value of its property, as to debts already created or authorized by law to be created. *As to such indebtedness, the provision is as though it were not in the Constitution.* But this provision was not fully remedial, since some counties may have already incurred debts exceeding 3½ per centum of the value of their assessed property, and to meet this condition another proviso was added that in such case the county 'shall be authorized to incur an indebtedness of one and a half per centum of the assessed value of such property, in addition to the debt already existing.' Without more, and literally construed, this proviso might have limited the authority of the county to increase its indebtedness in the case supposed, to 'the debt already existing.' But this same proviso, concludes by adding, 'Nothing herein contained shall prevent any county from issuing bonds, or other obligations, to fund or refund any indebtedness now existing or authorized by existing laws to be created.' * * * It is shown that under this act the court of county commissioners have issued $187,500 of these bonds in and about carrying into effect the provisions of said act. It thus appears that the total indebtedness of the county, authorized by said act to be created for the purposes specified, was $250,000, one hundred and eighty-seven thousand five hundred of which amount has already been created, and the remaining $62,500, to which the special act in question relates is a part of that $250,000, *and was as fully authorized and required by the original act to be created, as that part of it for which the county has already issued its bonds.* The act we construe simply authorizes the funding of the $62,500, as a part of the debt of the county theretofore authorized

to be created, and is not violative of said section 224 of the present Constitution." (Italics supplied.)

In Sisk v. Cargile, supra, the affirmance of the decree sustaining demurrer to the bill for want of equity—the gravamen of which was that the special levy of taxes sought to be made and to be applied to an illegal indebtedness—was an early and positive construction of the first proviso to section 224 of the Constitution. The result there announced could only be justified by the construction that the whole bonded indebtedness of Jackson county, $250,000 for roads and bridges under the act of December 7, 1898, was not only authorized, but was positively required by a mandatory statute to be issued. The bonded indebtedness in question was incurred by the county without the exercise of judicial discretion on the part of its court of county commissioners, but that discretion was exercised for the county by the Legislature. Within the purpose and letter of the act, and of section 224 of the Constitution, it was an indebtedness required by existing law to be created, and within the exception and the provision of the Constitution for an additional indebtedness by the county. As such legal obligation or indebtedness the Constitution intended and did make provision to enable such strangulated county thereafter to properly conduct its business and meet its public necessities as one of the municipalities of the state, by exception from the limitation of the general rule imposed upon and prescribed for counties not indebted in a sum "greater than 3½ per centum of the assessed value of the property" in the county. Otherwise stated, the effect of Sisk's Case was to so interpret the first exception or proviso to the Constitution:

"This limitation shall not affect any existing indebtedness in excess of such three and one-half per centum, which has already been created or authorized by existing law to be created"

—as to enable a county to meet its obligations and pay its debts of the several classes, to wit: (1) That existing at the time of the adoption of the Constitution; and (2) that to which the county was irrevocably committed—either by specific and mandatory legislation, or by having so officially acted, under permissive statute. The logical effect of the decision in Sisk's Case was to effectuate the purpose and intent of the constitutional convention, and the several provisions of section 224 of the Constitution, by construing the words of the first proviso, "indebtedness in excess" and "already been created," to be of like import or legal effect as "already incurred a debt" of the second proviso, and the words "indebtedness in excess * * * authorized by existing law to be created" of the

first proviso, as being embraced within the concluding words of the second proviso, "the debt already existing."

The application of this construction to the Jackson county courthouse contracts, as the facts are presented in the instant bill of the county's indebtedness or binding obligation, created or authorized by existing laws to be created at the time of the Governor's proclamation of the adoption of the Constitution, has but one logical result—that being "required" under the act of December 7, 1898, to complete the designated system of improved roads and bridges, and acting thereunder, the road commissioners having initiated material improvements and incurred a large indebtedness at the time the Constitution became effective, the whole bond issue of $250,000 (in contemplation of law) was credited to the road commissioners, and was beyond the exercise of any judgment or discretion of the commissioners' court of that county. This being true, the whole amount of said bonds, whether actually issued or not, at the time the Constitution became effective, was a binding obligation or indebtedness of that county, authorized by existing law to be created, and as such was operative for the additional relief of the county within the terms of the second proviso of section 224 of the Constitution, giving authority to such county to incur additional indebtedness of 1½ per centum of the assessed value of taxable property therein.

I come now to note the construction heretofore given provisions of section 224 of the Constitution on first appeal in this case. Gunter v. Hackworth, 182 Ala. 205, 208, 210, 212, 62 South. 101, 102, 103. It was there observed:

" * * * The court held that the proposed additional issue of bonds constituted an indebtedness authorized by existing law (at the time of the ratification of the Constitution) to be created, saying, 'as to such indebtedness, the provision is as though it were not in the Constitution.' Nobody doubts the correctness of that decision. * * * We cannot conceive that the constitutional convention, in framing a debt limitation, had in view the prohibition of indebtedness incurred, or to be incurred, without relation to governmental affairs of the counties. The language employed is not apt to the expression of such purpose, nor was its expression necessary in any event. But to construe the exception as authorizing counties to borrow money or contract debts without limit in the execution of those purposes for which they were organized, and to provide for which they had always been empowered to levy taxes, would make the exception coextensive with, and thus destroy, the inhibition. Furthermore, that construction would involve a departure from the evident purpose of the proviso. * * * The proviso or exception must therefore have a more restricted meaning than appellees would assign to it, and we are satisfied that it finds complete expression according to the constitutional purpose in cases

of like character with that shown in Sisk v. Cargile, supra. * * * The argument seems to be that the debts 'already incurred' of the second proviso mean the same thing as the debts 'authorized by existing laws to be created' of the first proviso. But we think there is a manifest difference between debts already incurred and debts authorized to be created, and the change of phraseology in passing from one proviso to the other is evidence enough that the convention did not consider the two phrases to be equivalent of each other. Here again the convention was dealing with a then present status, and authorized an additional indebtedness of 1½ per centum of the then assessed values of counties which already were indebted in an amount exceeding 3½ per centum of their then values, however much the total indebtedness thus created might exceed 5 per centum of the then assessed value of the county."

In this connection it is pertinent to inquire: What period or event is designated or declared in said section of the Constitution for the termination of the unequal right and power given the several counties to contract debts, dependent upon the amount of its municipal debt or financial obligation, as we have defined these words? The answer is: When the assessed values of properties in a county have so increased as that its debt or binding financial obligation does not exceed 3½ per centum of such assessed values therein. This becoming a fact, the reason ceases for the exception in behalf of such county formerly sustaining such excess indebtedness. With such changed financial condition of the county, the extraordinary constitutional provision to contract an additional indebtedness of 1½ per centum, or any portion thereof, of the assessed value of such property in addition to the debt already existing—"created or authorized by existing law to be created"—is no longer available to such county.

What, then, is the basis of calculation? Mr. Gray, in his Limitations of Taxing Power and Public Indebtedness, § 2157, said:

"Generally the last preceding annual assessment is taken as the basis of calculation."

That is to say, the last assessment, completed, fixed and final; the value upon which the tax rate is imposed for the production of the revenues is the declared basis in this jurisdiction (Smith v. Austin, 200 Ala. 472, 76 South. 404, 405; First Nat. Bank of Abbeville v. Terry-Briggs & Co., 83 South. 170;[1] Potts v. Court of County Com'rs of Conecuh Co., 82 South. 550[2]): The current assessment when the bonds are issued, or when the debt is contracted or becomes a binding financial obligation of the county is the basis of calculation, and not that assessed value when the Constitution became of force (O'Rear v. Sartain, supra; Goodson v. Dean, 173 Ala. 310,

55 South. 1010; Stokes v. City of Montgomery, ante, p. 307, 82 South. 663).

That I be not misunderstood, I may add: The debt of the county "exceeding 3½ per centum of the assessed value of the property therein" is based on the assessed values of property in the county at the date the Constitution became of force, by virtue of the Governor's proclamation, November 28, 1901. Seay's Compiled Amendments to the Constitution, p. 1. This is necessary to determine whether a county was thereafter entitled to incur an additional "indebtedness of 1½ per centum of the assessed value" of property therein, and this excess indebtedness must exist at the time the additional indebtedness is sought to be incurred by such county. When the county has said right to incur an additional indebtedness (of not more than 1½ per centum of the assessed values of property in the county), the amount thereof is based on the calculation of 1½ per centum of the "assessed value of such property," not at the time the Constitution became effective by the Governor's proclamation, but of the amount of its assessed value at the time the financial obligation or debt is sought to be incurred by the county's officials having authority to act in such matter, or at the time the financial obligation is fixed upon the county by specific mandatory legislation.

The writer assented to denial of writ of certiorari to the Court of Appeals in Moody v. Terrell-Hedges Co., 78 South. 639,[3] on the assumption, and, in fact, on the recited concession of parties, that at the time of the making of the contract of purchase of the electric light fixtures in question, and at the time of installation of the same, the county was indebted beyond its constitutional limit, and for said reason such contract of purchase and installation was illegal and void. Such being the fact, the application of common-law principles thereto made by the Court of Appeals supported the conclusion clearly announced by Judge Samford. Gray, Limitation of Taxing Powers, § 2083. The same fact of excess indebtedness of Jackson county was conceded in Southern Rwy. v. Jackson Co., 189 Ala. 436, 438, 66 South. 570.

The holding of Gunter v. Hackworth, supra, that said road and bridge bonds issued by Jackson county after the adoption of the Constitution, and required to be issued by the act of December 7, 1898, constituted a debt authorized by law to be created, and were within the first proviso of section 224 of the Constitution, is in consonance with the conclusion we announce. The further announcement there made, that said subsequent issue of bonds was not a debt already incurred within the second proviso, so as to au-

---

[1] Ante, p. 401.        [2] Ante, p. 300.             [3] 16 Ala. App. 441.

thorize the additional indebtedness of 1½ per centum by that county, is contrary to the view now given expression. So, also, the announcement there made, that the additional indebtedness of 1½ per centum of the then (at the time of the adoption of the Constitution, November 28, 1901) assessed values of property within counties already indebted in an amount exceeding 3½ per centum, was not intended to be based on thereafter assessed values of property in the county, is opposed to the construction that should be given the second proviso of section 224 of the Constitution. To this extent Gunter v. Hackworth, supra, should be modified.

The facts material to a final determination of the cause are presented by pleading. However, we may say that the judgment may be rested on the admitted and proven facts. The agreement of counsel was to the effect that—

"All the affirmative averments of facts set forth in the answer and the exhibits thereto filed in cause No. 1825 shall be taken as true, except that any and all averments relative to the effect of the issue of bonds under the act of December 7, 1898, are to be treated as matters of law and not as an admission of any fact."

An averment in said answer of respondents was as follows:

"Respondents aver that the whole issue of bonds, aggregating $250,000, was one debt, created under one and the same act for the construction of macadamized roads and bridges, approved December 7, 1898, by which the county authorities were authorized and required to incur said debt by mandatory law; that the whole of said indebtedness was an existing indebtedness, or a debt already incurred, within the meaning of section 224 of the Constitution. They aver, further, that the system of macadamized roads and bridges set out, required to be constructed under said bond act, was in process of construction when the Constitution became effective; that under the authority and provisions of said bond act contracts for the construction of such roads and bridges had already been entered into and were in process of execution, creating obligations of the county in excess of 3½ per centum of the then assessed values of the property of the county."

The evidence further shows that the indebtedness incurred by the courthouse contracts and all other existing indebtedness (exclusive of the $250,000 bonded road and bridge indebtedness)—for courthouse, $39,299; other registered indebtedness, $7,062; aggregating $46,361—was less than 1½ per centum of the tax values in 1901 ($4,133,243), when the Constitution became effective. The two courthouse contracts were within the provision and protection of the second proviso of section 224 of the Constitution and are the valid, subsisting, and binding obligations of Jackson county.